**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

IN RE: CELLA, III, LLC                                    CIVIL ACTION

                                                          NO. 21-71-WBV-JVM

                                                          SECTION: D (1)

<u>**ORDER AND REASONS**</u>

This is a bankruptcy appeal filed by Cella III, LLC ("Cella") pursuant to Fed. R. Bankr. P. 8003 and 28 U.S.C. § 158(a) from the December 29, 2020 Memorandum Opinion and Judgment of the United States Bankruptcy Court for the Eastern District of Louisiana (the "Bankruptcy Court"), in which the Bankruptcy Court dismissed Cella's Petition for Declaratory Judgment, Breach of Contract of Lease, and Damages after a three-day trial held on September 18, 21, and 22, 2020.[1] Before the Court is an Appellant brief filed by Cella on April 9, 2021,[2] an Appellee brief filed by Jefferson Parish Hospital District No. 2 d/b/a East Jefferson General Hospital ("EJGH") on May 7, 2021,[3] and a Reply brief filed by Cella on May 24, 2021.[4]

After careful consideration of the pleadings, memoranda, exhibits, trial testimony, and deposition testimony, the Court finds that the appeal has no merit and the decision of the Bankruptcy Court is **AFFIRMED.**

---

[1] R. Doc. 1.
[2] R. Doc. 4.
[3] R. Doc. 7.
[4] R. Doc. 10.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. The May 12, 2016 Lease.

This appeal arises out of a lease dispute between Cella and EJGH.  On or about May 12, 2016, the parties executed a lease (hereafter, the "Lease"), whereby EJGH leased property owned by Cella and located at 4545 Veterans Boulevard in Metairie, Louisiana, which formerly housed a bank and includes certain parking spaces and common areas (hereafter, the "Leased Premises").  The Leased Premises had been vacant for approximately one year when the parties executed the Lease.[5]  Under the "Permitted Use" section of the Lease agreement, Cella agreed to EJGH's use of the Leased Premises "for operation of a 'Community Medical Center', defined as the provision of healthcare related services."[6]  The Lease specifies that EJGH "shall have full and unlimited access and use of the Premises for build-out/construction."[7]  The Lease also provides that EJGH "shall be responsible for operation and maintenance of the Leased Premises, including payment of all agreed-upon expenses related to said operation and maintenance," including, among other things, insurance.[8]  The Lease requires EJGH to obtain its own insurance covering commercial general liability, property damage, worker's compensation, flood hazard, and business interruption and, with the exception of worker's compensation insurance, EJGH must

---

[5] R. Doc. 1-2 at p. 7 (*citing* Hearing Transcript 68:25-69:14 (Sept. 20, 2020)).  *See,* Hearing Transcript from September 18, 2020, Bankr. Docket R. Doc. 163 at pp. 68-69; R. Doc. 1-1 at p. 8, ¶ VII in Civ. A. No. 19-11743-WBV-JVM, *Cella III v. Jefferson Parish Hospital Service District No. 2* (E.D. La.) (hereinafter, "*Cella I*").

[6] Trial Joint Exhibit 1 at § 10; R. Doc. 1-2 at p. 7 (*quoting* Lease, § 10).  *See,* Trial Joint Exhibit 1 at § 10.

[7] Trial Joint Exhibit 1 at §§ 6 & 8.

[8] Trial Joint Exhibit 1 at § 8.

name Cella as an additional insured on the policies.[9]  EJGH must also obtain an "All Risk Builder's Risk policy to cover the entire value of improvements made by Lessee while work is underway."[10]

The Lease further requires EJGH to pay a base monthly rent plus common area maintenance ("CAM") charges.[11]  The Lease provides an initial term of 120 months "commencing on the lease Commencement Date, ('Commencement Date'), and ending at midnight on the day before the tenth (10th) anniversary of the Commencement Date."[12]  In turn, the "Commencement Date" is defined as "the earlier to occur of two hundred forty (240) days following Lease execution or receipt of license to operate as a 'community emergency center' (CEC) by the licensing bodies."[13]  The Lease provides that EJGH has the right to terminate the Lease at the expiration of the fifth lease year, but must give Cella written notice of its intent to terminate at least 180 days before the expiration of the fifth year of the lease.[14]  EJGH also has the option to renew the Lease for three additional periods of 60 months, called "Renewal Terms," upon timely written notice of the election, if the Lease is still in effect and EJGH is not in default.[15]  The Lease also contains a rent abatement clause, specifying that no base rent, pro-rata CAM, property tax, or property

---

[9] *Id*. at § 13.
[10] *Id*. at § 13(A)(iii).
[11] *Id*. at §§ 4 & 5.
[12] *Id*. at § 2(A).
[13] *Id*. at § 3.
[14] *Id*. at § 2(B).  According to the Bankruptcy Court, at the time of trial (September 2020), LCMC Health, a New Orleans-based non-profit health system, was in the process of acquiring EJGH.  R. Doc. 1-2 at p. 8, n.4 (citations omitted).  The Bankruptcy Court found that the acquisition was finalized as of October 1, 2020, and that knowledge of that closing is in the public domain.  *Id*. (citation omitted).
[15] Trial Joint Exhibit 1 at § 2(C).

insurance payments shall be due from EJGH "for Months 1 through 8 after lease execution for the Leased Premises during the period between the Lease Execution and the Commencement Date, but such shall be required beginning in Month 9 and thereafter."[16]

**B. Cella's Lawsuit Against EJGH.**

On or about September 12, 2018, Cella filed a Petition for Declaratory Judgment, Breach of Contract of Lease, and Damages (the "Petition") against EJGH in the 24th Judicial District Court for the Parish of Jefferson, State of Louisiana. Cella sought a declaratory judgment that, based upon the terms of the Lease and the extrinsic evidence, EJGH is required to build-out a "Free-Standing Emergency Department" or pay Cella damages in "an amount to have someone else build-out the building as a Free-Standing Emergency Room in accordance with the plan submitted by EJGH."[17] Cella also sought a declaratory judgment that EJGH breached several provisions of the Lease, failed to timely cure the breaches within 30 days, and, therefore, that Cella may immediately terminate the Lease under Section 21(A)(ii) and collect accelerated rents, costs, and attorney's fees.[18] Finally, Cella asserted a breach of contract claim against EJGH.[19]

---

[16] *Id.* at §§ 3, 7.
[17] *See,* R. Doc. 1-1 at pp. 14-15 in *Cella I.*
[18] *Id.* at p. 15.
[19] *Id.* at p. 16.

### C. The Bankruptcy Proceeding.

Cella subsequently filed a Voluntary Petition for Bankruptcy in the Eastern District of Louisiana on June 5, 2019.[20]  Shortly thereafter, on July 18, 2019, Cella removed the case to this Court pursuant to 28 U.S.C. §§ 1334(b), 1446(a), and 1452, as well as Fed. R. Bankr. P. 9027, on the basis that the claims were "related to" an ongoing bankruptcy case.[21]  This Court referred the matter to the Bankruptcy Court on October 23, 2019,[22] where it was allotted to Judge Jerry Brown.[23]  Cella's bankruptcy case and this adversary proceeding were reassigned to Judge Meredith S. Grabill on July 16, 2020, in anticipation of Judge Brown's retirement.[24]  Although EJGH, for the first time on July 30, 2020 and again at the start of the three-day trial, notified the Bankruptcy Court and Cella that it did not consent to the Bankruptcy Court's entry of final orders or judgment in this action, the Bankruptcy Court found that EJGH impliedly consented to its jurisdiction when it asked Judge Brown to enter final judgment on four motions for summary judgment and by its failure to object to the jurisdiction of the Bankruptcy Court before the start of the trial.[25]  The parties do not challenge this finding by the Bankruptcy Court in this appeal.

After conducting a three-day trial in the matter in September 2020, the Bankruptcy Court issued a Memorandum Opinion and Judgment on December 29, 2020, finding that Cella failed to meet its burden of proving EJGH breached the Lease

---

[20] *See,* R. Doc. 1-2 at p. 2; R. Doc. 1 at ¶ 7 in *Cella I.*
[21] *See,* R. Doc. 1 at Introductory Paragraph and ¶ 6 in *Cella I.*
[22] *See,* R. Doc. 18 in *Cella I.*
[23] R. Doc. 1-2 at p. 2.
[24] *Id.* at p. 5.
[25] R. Doc. 1-2 at pp. 5-6.

and, as such, Cella was not entitled to damages on any of the claims in its Petition.[26] Specifically, the Bankruptcy Court concluded that EJGH's failure to develop a community medical center on the Leased Premises did not constitute a breach of the Lease "at this time," and that EJGH had not breached the Lease by failing to obtain and maintain the insurance required.[27]   In its Memorandum Opinion, the Bankruptcy Court first made findings of fact regarding Cella's business and capital structure and certain Lease provisions.[28]   The Bankruptcy Court conducted a thorough and in-depth review of the Lease provisions at issue in this case, and neither party has challenged those factual findings on appeal.  In its conclusions of law, the Bankruptcy Court applied Louisiana's choice-of-law provisions and determined that Louisiana law governs the contract.[29]   Applying Louisiana contract law to this dispute, the Bankruptcy Court concluded that EJGH's failure to develop a community medical center on the leased premises does not constitute a breach of the Lease.[30] Staying within the four corners of the Lease, the Bankruptcy Court found that the intent of the parties regarding their obligations under the Lease could be ascertained by a careful reading of each unambiguous provision and the Lease as a whole.[31]  As a result, the Bankruptcy Court considered only the plain terms of the Lease, and did not consider any extrinsic evidence.

---

[26] R. Docs. 1-2 & 1-3.
[27] R. Doc. 1-2 at pp. 17-21.
[28] *Id*. at pp. 6-12.
[29] *Id*. at pp. 12-14.
[30] *Id*. at pp. 17-20.
[31] *Id*. at p. 17.

Reviewing the Lease as a whole, the Bankruptcy Court found that the parties intended EJGH to have the right to make Cella-approved improvements to the Leased Premises at its own cost, and the right to operate a "Community Medical Center" on the leased premises, defined as "provision of healthcare related services."[32]   The Bankruptcy Court pointed out that Cella gave EJGH an "improvement allowance" in the form of rent abatement for the first eight months of the Lease.[33]   Nonetheless, Bankruptcy Court concluded that EJGH did not breach the Lease because the Lease does not place a time limit on EJGH to construct a "Community Medical Center."   Finding the case analogous to the facts in *McCrary v. Park South Properties*, the Bankruptcy Court held that Cella and EJGH are sophisticated commercial parties evidenced by, among other things, the inclusion of a merger clause in the Lease, and if they had intended to impose a timetable for the development of the property it would have been expressly included in the Lease.[34] The Bankruptcy Court concluded that, "Indeed, the plain terms of the Lease indicate that parties [sic] anticipated that the construction of a 'Community Medical Center' was not a guaranteed endeavor, as it was dependent upon obtaining licensing and permitting from third parties . . . ."[35]   The Bankruptcy Court then quoted Section 28 of the Lease, entitled "Contingencies," which made the execution of the Lease contingent upon the receipt of a Zoning Certification Letter from the Jefferson Parish

---

[32] *Id*. at p. 18 (*quoting* Lease, §§ 7-8 & 10-11).  *See,* Trial Joint Exhibit 1 at §§ 7-8 & 10-11.

[33] R. Doc. 1-2 at p. 18 (*citing* Lease, §§ 3 & 7(A)(1)).  *See,* Trial Joint Exhibit 1 at §§ 3 & 7(A)(1).

[34] R. Doc. 1-2 at p. 18 (quoting *McCrary*, 560 So.2d 38, 48 (La. App. 2 Cir. 1990)) (internal quotation marks omitted).

[35] R. Doc. 1-2 at p. 18.

Zoning Administrator, certifying or confirming that the operation of a "Community Medical Center" is a permitted use of the Leased Premises.[36]  Section 28 of the Lease also states that the Lease will be contingent upon the issuance of required licensing by the Louisiana Department of Health and Human Services authorizing the use of the Leased Premises for a "Community Medical Center."[37]  The Bankruptcy Court further noted that Section 28 of the Lease allowed EJGH to terminate the Lease before day 45 of the Lease, forfeiting only the first month's rent and CAM charges, if those approvals were not obtained within 45 days of the execution of the Lease.[38]

The Bankruptcy Court held that in this case, the Lease became effective regardless of whether EJGH obtained regulatory approval to operate a community emergency center on the Leased Premises.  Contrasting the facts of this case and the *McCrary* case with those of *Crescent City Liquidation Trust v. Mirage Resorts, Inc.*, the Bankruptcy Court noted that the parties "did not include a 'drop-dead' date by which EJGH was obligated to obtain regulatory approvals to operate as a community emergency medical center on the Leased Premises," and that, "neither party here argues that obtaining regulatory approvals constituted a suspensive condition to be met before the contract became effective, suggesting that the primary 'cause' for the Lease, at least on Cella's part, was the collection of rent for the Leased Premises."[39] The Bankruptcy Court pointed out that although the regulatory approvals were not

---

[36] *Id.* (*quoting* Lease, § 28).  *See,* Trial Joint Exhibit 1 at § 28.
[37] R. Doc. 1-2 at pp. 18-19 (*quoting* Lease, § 28).  *See,* Trial Joint Exhibit 1 at § 28.
[38] R. Doc. 1-2 at p. 18 (*citing* Lease, § 28).  *See,* Trial Joint Exhibit 1 at § 28.
[39] R. Doc. 1-2 at p. 19, n.7 (citing *McCrary*, 560 So.2d 38, 48 (La. App. 2 Cir. 1990; *Crescent City*, Civ. A. No. 01-899, 2002 WL 1046709 (E.D. La. May 20, 2002)).

obtained within the 45-day inspection period, EJGH did not exercise its option to terminate the Lease.  The Bankruptcy Court further found that the definition of the "Commencement Date" of the Lease ("The Lease Commencement Date shall be the earlier to occur of two hundred forty (240) days following Lease execution or receipt of license to operate as a 'community emergency center' (CEC) by the licensing bodies"[40]) "left room for the possibility that those required licenses and permits would not be obtained within the first 240 days of the execution of the Lease—or at all— … and EJGH would start paying rent" on the earlier of 240 days following Lease execution or receipt of a license to operate as a community emergency center.[41]  The Bankruptcy Court found the plain language of that section of the Lease, providing for the commencement on the earlier of two dates, provided for the commencement of the Lease, whether or not EJGH received a license to operate as a community emergency center.  The Bankruptcy Court noted that EJGH's monthly rental obligation during the life of the Lease was not affected by whether or not EJGH made any improvements to the Leased Premises.

The Bankruptcy Court further found that the parties stipulated at trial that EJGH's total monthly rental obligation under the Lease, including the monthly base rent and CAM charges that began in month nine, is $43,499.82.[42]  The parties had also stipulated at trial that EJGH has always made timely monthly rental payments in the amount of $43,499.82 up to the date of trial, resulting in the total payment of

---

[40] Trial Joint Exhibit 1 at § 3.
[41] R. Doc. 1-2 at p. 20 (*quoting* Lease, § 3) (internal quotation marks omitted).  *See,* Trial Joint Exhibit 1 at § 3.
[42] R. Doc. 1-2 at p. 20.

$1,952,929.58.[43]   The Bankruptcy Court concluded that while the parties' intention vis-à-vis the Lease was for EJGH to build and operate a "community medical center" on the Leased Premises, the parties failed to include any time limits under which EJGH would be obligated to obtain the regulatory approvals required to do so.[44] Thus, the Bankruptcy Court concluded that, "The plain, unambiguous terms of the Lease indicate that the parties contemplated that the required regulatory approvals may never arrive . . . leaving EJGH with only the obligation to pay rent, which it has done."[45]   The Bankruptcy Court noted that, "Time still exists under the Lease for EGJH [sic], or now its successor, LCMC Health, *see supra* note 4, to develop the Leased Premises," and that, "Although the Court finds that no breach of the Lease has occurred by EJGH as of the date of trial, the Court makes no ruling at this time regarding whether a breach could occur and damages could accrue before or at the end of the term of the Lease."[46]

The Bankruptcy Court also concluded that EJGH had not breached the Lease by failing to obtain and maintain insurance on the Leased Premises, as required under the Lease.  The Bankruptcy Court found that Section 13 of the Lease required EJGH to obtain and maintain in full force and effect at all times during the term of the Lease its own commercial general liability and property damage insurance, worker's compensation insurance, flood hazard insurance, and business interruption insurance, and to obtain and maintain a builders risk insurance policy "to cover the

---

[43] *Id.* (citation omitted).
[44] *Id.*
[45] *Id.* (internal citation omitted) (*citing* Lease, §§ 3, 28).  *See,* Trial Joint Exhibit 1 at §§ 3, 28.
[46] R. Doc. 1-2 at p. 20 (citations omitted).

entire value of improvements made by Lessee while work is underway."[47]  The Lease also required that Cella be listed as an additional insured on all of the polices except the worker's compensation policy.  The Bankruptcy Court pointed out that Ellen Marallo, EJGH's Risk Manager and Compliance Analyst, testified that she is the person responsible for "anything that has to do with insurance, anything that has to do with any claims or exposures for the hospital as well as licensures."[48]  The Bankruptcy Court concluded:

> Her credible and unrefuted testimony and documentary evidence regarding insurance coverage under the Lease showed that EJGH maintained all required insurance coverage during the term of the Lease, maintained builders risk insurance up to the date that development of the Leased Premises was interrupted on January 2, 2018 (satisfying the Lease's requirement for such coverage "while work is underway"), and listed Cella as an additional insured where required.[49]

Based on the evidence presented at the trial, the Bankruptcy Court held that EJGH satisfied the terms of the Lease by obtaining and maintaining the required insurance protections and designating Cella as an additional insured where required.

Because the Bankruptcy Court found that Cella had failed to meet its burden to show that EJGH had breached the Lease, the Bankruptcy Court concluded that Cella was not entitled to damages for any of the claims alleged in its Petition.  The Bankruptcy Court ultimately dismissed the Petition in its entirety, and issued a separate Judgement pursuant to Fed. R. Civ. P. 58 and Fed. R. Bankr. P. 9021.[50]

---

[47] R. Doc. 1-2 at p. 21 (*quoting*, Lease, § 13).  *See*, Trial Joint Exhibit 1 at § 13.
[48] R. Doc. 1-2 at p. 21 (*quoting* Hearing Transcript 374:20-22).  *See*, Bankr. Docket R. Doc. 164 at p. 70.
[49] R. Doc. 1-2 at p. 21 (*citing*, Hearing Transcript 374:23-414:21 (Sept. 21, 2020); Trial Joint Exhibits 5-7 & Exhibit J).  *See*, Bankr. Docket R. Doc. 164 at pp. 70-110.
[50] R. Doc. 1-2 at p. 22; R. Doc. 1-3.

### D. Cella's Bankruptcy Appeal.

On January 13, 2021, Cella appealed the Bankruptcy Court's Memorandum Opinion and Judgment pursuant to Fed. R. Bankr. P. 8003.[51]  Cella contends that the Bankruptcy Court erred in failing to find that EJGH breached the Lease and by failing to award Cella damages, costs, and attorney's fees.[52]  Although Cella claims there are 12 issues raised in his appeal, the Court finds that these points of contention can be distilled into the following issues: (1) whether the Bankruptcy Court erred by finding that EJGH did not breach the Lease by failing to build a "Free-Standing Emergency Room" or Community Medical Center on the Leased Premises; (2) whether the Bankruptcy Court erred in finding that EJGH did not breach the Lease by failing to operate a business on the Leased Premises; (3) whether the Bankruptcy Court erred in failing to find that EJGH breached the Lease by failing to properly maintain the Leased Premises; (4) whether the Bankruptcy Court erred in failing to find that EJGH breached the insurance provisions of the Lease; and (5) whether the Bankruptcy Court erred in denying Cella's request for damages.[53]  Cella contends that the Trial Stipulations, wherein EJGH agreed that it has never operated a "Community Medical Center" or any other healthcare facility or business on the property and has no intention of building out a Free-Standing Emergency Room at the property is sufficient on its own to prove a breach.

---

[51] R. Doc. 1.
[52] R. Doc. 4 at p. 10.
[53] R. Doc. 4 at pp. 10-11.

In response, EJGH asserts that the Bankruptcy Court's interpretation of the Lease was not in error and should be affirmed.[54]  EJGH asserts that it does not dispute the Trial Stipulations; instead, it relies on the language of the Lease Agreement itself, which allows, but does not require, the operation of a medical facility.  Agreeing with the Bankruptcy Court, EJGH argues that the Lease contains no mandate to operate and no timeline for completion of the improvements, and that no insurance mandate or other clause was breached by EJGH.[55]  EJGH contends that Cella's appeal posits no grounds for reversal, and only sets forth Cella's disagreement with the Bankruptcy Court's ruling.[56]  In its Reply brief, Cella claims that, "The arguments raised by EJGH are more mudslinging than substantive, and are ultimately unavailing."[57]  The Reply brief largely reiterates the arguments raised in Cella's Appellant brief.

## II.   LEGAL STANDARD

This Court has jurisdiction to hear this bankruptcy appeal pursuant to 28 U.S.C. § 158(a)(1), which gives district courts jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges entered in cases and proceedings referred to them under 28 U.S.C. § 157.[58]  "The standard of review applicable to this bankruptcy appeal is identical to the standard of review employed

---

[54] R. Doc. 7.
[55] *Id*. at p. 5.
[56] *Id*. at pp. 4-5.
[57] R. Doc. 10 at p. 4.
[58] 28 U.S.C. § 158(a)(1); *Crescent City Liquidation Trust v. Mirage Resorts, Inc.*, Civ. A. No. 01-899, 2002 WL 1046709, at *1 (E.D. La. May 20, 2002) (Duval, J.).

by a court of appeal reviewing a district court proceeding."[59]  As such, the Court reviews the Bankruptcy Court's conclusions of law *de novo*, its findings of fact for clear error, and any mixed questions of law and fact *de novo*.[60]  This Court will reverse the Bankruptcy Court's factual findings "[o]nly upon a definite and firm conviction" that the Bankruptcy Court erred.[61]

## III.   ANALYSIS

### A.  Cella's Breach of Contract Claims

As previously mentioned, Cella argues on appeal that the Bankruptcy Court erred in failing to find the EJGH breached the Lease by: (1) failing to build a Community Medical Center on the Leased Premises; (2) failing to operate a business on the Leased Premises; (3) failing to properly maintain the Leased Premises; and (4) failing to obtain the required insurance.

#### 1. *Louisiana contract law applies to Cella's breach of contract claims.*

According to the Fifth Circuit, "Interpretation of a contract is a legal question reviewed de novo."[62]  At the outset, the Court notes that neither party contests the Bankruptcy Court's conclusion that Louisiana law applies to this contract dispute. This Court reaches the same conclusion.  As the Bankruptcy Court pointed out, the Lease contains a choice-of-law provision through which the parties agreed that, "This

---

[59] *In re Taylor*, Civ. A. No. 12-1908, 2013 WL 647501, at *2 (E.D. La. Feb. 21, 2013) (Morgan, J.) (*citing* 28 U.S.C. § 158(c)(2); *In re National Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000)).

[60] *In re Taylor*, Civ. A. No. 12-1908, 2013 WL 647501 at *2 (citing *In re National Gypsum Co.*, 208 F.3d at 504).

[61] *In re Quinlivan*, 434 F.3d 314, 318 (5th Cir. 2005) (citing *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

[62] *Feld Motor Sports, Incorporated v. Traxxas, L.P.*, 861 F.3d 591, 597 (5th Cir. 2017) (citing *Hoffman v. L & M Arts*, 838 F.3d 568, 581 (5th Cir. 2016)).

Lease shall be governed and interpreted solely by the laws of the State of Louisiana."[63]   Under Louisiana law, contractual choice-of-law provisions are presumed valid unless the chosen law contravenes the public policy of the state whose law would otherwise apply.[64]   Further, the party seeking to prove such a provision invalid bears the burden of proof.[65]   Neither party in this case has argued that the choice-of-law provision in the Lease is invalid.   Thus, the choice-of-law provision is presumptively valid.

Additionally, "Where courts have bankruptcy jurisdiction, they similarly apply the choice of law rules of the forum in which they sit over state law claims that do not implicate federal policy."[66]   Under La. Civ. Code art. 3537, Louisiana's choice-of-law provision, "an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue."[67]   That determination is made by considering certain factors, including: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in La. Civ. Code art. 3515, as well as the policies of facilitating the orderly planning

---

[63] Trial Joint Exhibit 1 at § 32(C); R. Doc. 1-2 at p. 13 (*quoting* Lease, § 32(C)) (internal quotation marks omitted).
[64] *Axis Oilfield Rentals, LLC v. Mining, Rock, Excavation and Construction, LLC*, 166 F. Supp. 3d 684, 690 (E.D. La. 2016) (*citing* La. Civ. Code art. 3540).
[65] *Axis Oilfield*, 166 F. Supp. 3d at 690 (citing *Barnett v. Am. Const. Hoist, Inc.*, 2011-1261 (La. App. 1 Cir. 2/10/12), 91 So.3d 345, 349).
[66] *Lentz v. Trinchard*, 730 F. Supp. 2d 567, 582 (E.D. La. 2010) (Africk, J.) (citing *Asarco LLC v. Americas Mining Corp.*, 382 B.R. 49, 60-61 (S.D. Tex. 2007)).
[67] La. Civ. Code art. 3537.

of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.[68]  Although the parties have not addressed these factors, the applicable law is not in dispute.  For the same reasons set forth in the Bankruptcy Court's Memorandum Opinion, the Court finds that a majority of the factors weigh in favor of the application of Louisiana contract law to the Lease.[69]  As such, the Court will apply Louisiana law to Cella's breach of contract claims.

"In Louisiana, a breach-of-contract claim has three 'essential' elements: '(1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee.'"[70]  According to the Fifth Circuit, the first two elements—obligation and breach—involve issues of contractual interpretation as a matter of law and questions of fact regarding whether the actions of the parties actually constituted the alleged breach under the applicable contractual terms, while the third element—damages—is a question of fact.[71]  In Louisiana, "Interpretation of a contract is the determination of the common intent of the parties."[72]  "The words of a contract are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning."[73]  "When the words of a contract are clear and explicit

---

[68] *Id.*
[69] *See,* R. Doc. 1-2 at pp. 13-14.
[70] *IberiaBank v. Broussard,* 907 F.3d 826, 835 (5th Cir. 2018) (quoting *Favrot v. Favrot,* 2010-0986 (La. App. 4 Cir. 2/9/11), 68 So.3d 1099, 1108).
[71] *IberiaBank,* 907 F.3d at 835 (quotations omitted).
[72] La. Civ. Code art. 2045; *See, Guidry v. Am. Pub. Life Ins. Co.,* 512 F.3d 177, 181 (5th Cir. 2007) (*quoting* La. Civ. Code art. 2045).
[73] *Guidry,* 512 F.3d at 181 (quoting *Cadwallader v. Allstate Ins. Co.,* 2002-1637 (La. 6/27/03), 848 So.2d 577, 580); *See,* La. Civ. Code art. 2047.

and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[74]   Whether contract language is clear or ambiguous is a question of law.[75]   A contract is ambiguous "when it is uncertain as to the parties' intentions" and when it is susceptible to more than one reasonable meaning under the circumstances and applicable rules of construction.[76]

### a. **EJGH's failure to build a Community Medical Center.**

According to Cella, "The issue before this Court on its *de novo* review is whether the bankruptcy court erred when it failed to find EJGH in breach of the Lease, even after EJGH stipulated facts that provided it was in breach."[77]   Cella contends that EJGH failed to comply with the provisions of the Lease requiring that EJGH complete a buildout of the Leased Premises, and that EJGH stipulated that it never completed the buildout and that it had no intention to do so.[78]   Thus, Cella claims that EJGH stipulated that it was in breach of the Lease and the Bankruptcy Court clearly erred when it failed to hold EJGH accountable for this breach.   Pointing to a footnote in the Bankruptcy Court's Memorandum Opinion, Cella asserts that the Bankruptcy Court suggested that it agreed with Cella's position, but was unwilling to hold EJGH in breach because "Time still exists under the Lease for EGJH [sic], or now its successor, LCMC Heath, see supra note 4, to develop the Leased Premises."[79]   Cella also relies on statements made by the bankruptcy judge previously assigned to

---

[74] La. Civ. Code art. 2046.
[75] *Guidry*, 512 F.3d at 181 (citing *Cadwallader*, 2002-1637, 848 So.2d at 580).
[76] *Guidry*, 512 F.3d at 181 (quoting *Lloyds of London v. Transcon. Gas Pipe Line Corp.*, 101 F.3d 425, 429 (5th Cir. 1996)).
[77] R. Doc. 4 at p. 4.
[78] R. Doc. 4 at pp. 4, 11-12.
[79] R. Doc. 4 at p. 14 (*quoting* Bankr. Docket R. Doc. 168 at p. 20, n.8).

this case (Judge Brown) during a hearing on EJGH's motions for summary judgment, during which Judge Brown "didn't buy" EJGH's argument that payment of the rent relieved EJGH of all its other obligations under the Lease.[80]

In response to EJGH's arguments regarding alleged breaches of the Lease, EJGH claims, quite plainly, that "the Lease does not say what Cella contends."[81] Regarding its alleged obligation to buildout the Leased Premises, EJGH admits that its anticipated use of the Leased Premises was as an emergency room,[82] but asserts that it had no affirmative obligation to build or operate a medical facility at the premises.[83]   Although Cella relies on Section 8 of the Lease, which makes EJGH "responsible for operation and maintenance of the Leased Premises," EJGH claims this clause clearly makes EJGH responsible for any operations that may occur, but does not dictate that those operations *must* occur.[84]   EJGH also points to Section 10 of the Lease, regarding the "Permitted Use" of the Leased Premises, asserting that Cella approved of EJGH's anticipated use of the premises as a medical facility, but did not require EJGH to use the premises in that manner.[85]   Finally, EJGH points to the Lease provision regarding the "Lease Commencement Date," which was the earlier of 240 days after its execution or receipt of a license to operate as a "community

---

[80] R. Doc. 4 at p. 15 (*quoting* Bankr. Docket R. Doc. 79 at pp. 9-10, 17-18) (internal quotation marks omitted).
[81] R. Doc. 7 at p. 15.
[82] *Id*. at p. 7.
[83] *Id*. at pp. 13-15.
[84] *Id*. at p. 14 (*quoting* Lease, § 8).  *See,* Trial Joint Exhibit 1 at § 8.
[85] R. Doc. 7 at p. 14 (*quoting* Lease, § 10).  *See*, Trial Joint Exhibit 1 at § 10.

emergency center" by the licensing bodies, as indicating that all of EJGH's obligations under the Lease were set to begin whether or not it received the license to operate.[86]

Despite their disagreements, the parties agree with the Bankruptcy Court that the language in the Lease is clear and unambiguous and should be interpreted based upon the four corners of the document.[87]   This Court reaches the same conclusion. Thus, the Court will determine the intent of the parties regarding their obligations under the Lease through a careful reading of the Lease provisions and the Lease as a whole, without considering extrinsic evidence.  Based upon the four corners of the Lease, the Court finds that Cella has failed to carry its burden of showing that EJGH breached the Lease by not building a "Community Medical Center" on the Leased Premises.

The Court agrees with EJGH and the Bankruptcy Court that there is no provision in the Lease that requires EJGH to build a medical facility on the Leased Premises.[88]  The Court recognizes that the Lease provides that EJGH "shall have full and unlimited access and use of the Premises for build-out/construction,"[89] and that, "Lessor agrees to Lessee's use of the leased premises for operation of a 'Community Medical Center', defined as the provision of healthcare related services."[90]  Neither of these provisions, however, are couched in mandatory terms.  Instead, by the terms'

---

[86] R. Doc. 7 at p. 14 (citation omitted).
[87] *See*, R. Doc. 4 at p. 13 ("Cella submits that the Lease at issue here is incredibly clear, as are EJGH's multiple breaches."); R. Doc. 7 at pp. 14, 20; R. Doc. 1-2 at p. 17.
[88] *See*, R. Doc. 1-2 at p. 18 ("Indeed, the plain terms of the Lease indicate that parties anticipated that the construction of a 'Community Medical Center' was not a guaranteed endeavor, as it was dependent upon obtaining licensing and permitting from third parties . . . .").
[89] Trial Joint Exhibit 1 at §§ 6, 8.
[90] *Id*. at § 10.

plain meaning, the Court finds that these provisions allow, but do not require, EJGH to build a "Community Medical Center."  Cella has failed to direct the Court's attention to any provision in the Lease that obligates EJGH to build a Community Medical Center on the Leased Premises.

Cella points the Court to Section 8 of the Lease, "General Lessee Responsibilities," which states that, "Lessee shall be responsible for operation and maintenance of the Leased Premises, including payment of all agreed-upon expenses related to said operation and maintenance."[91] That Section, specifically stating Lessee's responsibilities, is silent as to any obligation to operate a community medical center.  Indeed, the words "medical," "center," or "emergency," are not included in the section specifying EJGH's responsibilities. Further, the Section entitled "Lessee's Obligations and Rights," which falls under "Improvements and Alterations," is also silent as to any obligation to build a community medical center.[92]  Instead, that Section sets out EJGH's rights using terms including "shall have the right to" and "may" perform various construction projects.[93]

Section 7 of the Lease allows EJGH to make improvements to the Leased Premises at its own cost and subject to Cella's approval, and specifies that any fixed improvements will become Cella's property  when the Lease terminates, without any

---

[91] *Id*. at  § 8.
[92] *Id*. at § 7(B).
[93] *Id*.  Section  7 (B)(1) provides that EJGH "shall have the right to use reputable contractors," while Section 7(B)(3) provides that EJGH "shall have the right to put its name on both sides of the project's pylon/monument signs" and  "shall have the right to install an LED sign on the premises."  Section 7(B)(4) provides that EJGH "may renovate the exterior of the Building/Façade," and Section 7(B)(5) states that EJGH "shall have the right to fully screen units . . . ."  Finally, § 7(B)(6) states that EJGH "shall have the right to" construct two (2) canopies . . .

compensation to EJGH.[94]  The Lease further provides that Cella would give EJGH an "improvement allowance" in the form of rent abatement for the first eight months after execution of the Lease.[95]  These provisions reinforce the notion that EJGH was permitted, but not required, to make improvements on the Leased Premises.

Section 28 of the Lease, concerning "Contingencies," further supports the Court's conclusion.  Section 28 provides that the execution of the Lease "shall be continent upon the receipt of a Zoning Certification Letter from the Parish of Jefferson Zoning Administrator certifying or confirming that operation of a 'Community Medical Center,' 24 hours per day and 7 days per week, at this location is an allowed/permitted use."[96]  That provision further states that the Lease "will be contingent and conditioned upon the issuance of required licensing by the Louisiana Department of Health and Human Services and all other governmental agencies," and that EJGH "shall have forty-five (45) days following lease execution to perform inspections and seek government approvals."[97]  Additionally, "If approvals have not been obtained prior to the 45th day of the inspection period, at Lessee's will, Lessee may terminate the lease."[98]  Section 28, however, does not contain a deadline by which EJGH was required to obtain such licensures.  According to the parties, EJGH did not obtain these approvals within the 45-day inspection period, but did not exercise its option to terminate the Lease.  Thus, Section 28 indicates that the Lease

---

[94] *Id.* at §§ 7(A)(4) & 7(B)(1) &(2).
[95] *Id.* at §§ 3 & 7(A)(1).
[96] *Id.* at § 28.
[97] *Id.*
[98] *Id.*

will become effective regardless of whether EJGH obtains the necessary regulatory approval to operate its intended community emergency or medical center on the Leased Premises.

The Court further finds that Section 3 of the Lease, pertaining to the "Commencement Date," contemplates that those required licenses and permits might not be obtained within the first 240 days after execution of the Lease.  The Lease defines "Commencement Date" as the "earlier to occur of two hundred forty (240) days following Lease execution *or* receipt of license to operate as a 'community emergency center' (CEC) by the licensing bodies."[99]  Section 3 also provides that EJGH does not have to pay the base rent or CAM for the first eight months of the Lease, "during the period between the Lease Execution and the Commencement Date, but such shall be required beginning in Month 9 and thereafter."[100]  As the Bankruptcy Court keenly observed, "the definition of the 'Commencement Date' of the Lease left room for the possibility that those required licenses and permits would not be obtained within the first 240 days of the execution of the Lease—or at all—which is why the Lease would commence—and EJGH would start paying rent—on" the earlier of the two.[101]

To the extent Cella argues that the Trial Stipulations constitute "clear evidence" that EJGH breached the Lease by failing to build a Community Medical Center, the Court disagrees.  According to the "Trial Stipulations," submitted with Cella's Appellant brief, the parties stipulated, among other things, that: (1) when the

---

[99] *Id.* at § 3 (emphasis added).
[100] *Id.*
[101] R. Doc. 1-2 at p. 20 (*quoting* Lease, § 3) (internal quotation marks omitted).  *See*, Trial Joint Exhibit 1 at § 3.

Lease was executed, EJGH anticipated that it would open a "Free-Standing Emergency Room facility in the Property;" (2) that EJGH began construction on the Leased Premises in January 2017; and (3) that EJGH halted construction on the Leased Premises in August 2018 because "the financial position of the organization significantly changed" and "DHH got more direct in their position of wanting to keep and minimize free-standing ED's in the state . . [sic] that was not as apparent and definitely wasn't that direct [in 2016]."[102]  The parties also stipulated that EJGH's total monthly rental obligation is $43,499.82, which includes the base monthly rent and monthly CAM charges, and that, as of the date of the stipulations, "EJGH has paid, and Cella has accepted, without reservation, approximately $1,952,929.58 in rent and CAM charges.[103]  EJGH has not contested these stipulations.  Indeed, EJGH concedes that its intent was to build an emergency room, but that its intention to do so was thwarted by the Louisiana Department of Health and Hospitals.[104]

Based on a review of the foregoing Lease provisions, as well as the Lease as a whole, the Court finds that the unambiguous terms of the Lease indicate that the parties contemplated that EJGH may never obtain the required licensures or regulatory approvals to build a "Community Medical Center" on the Leased Premises. As such, the Court finds no error in the Bankruptcy Court's conclusion that EJGH's only obligation under the Lease was to pay the rent which, according to the Trial Stipulations, it has done.

---

[102] R. Doc. 4-1 at ¶¶ 13, 18, 21, 26, 27.
[103] *Id*. at ¶¶ 3, 4.
[104] R. Doc. 7

**b.  EJGH's failure to operate a business on the Leased Premises.**

Cella next claims that the Bankruptcy Court erred by not finding that EJGH breached the Lease by failing to operate a building on the Leased Premises, as required by Section 8 of the Lease.[105]  According to Cella, Section 8 provides that EJGH "***shall be responsible for*** operation and maintenance of the Leased Premises, including payment of all agreed-upon expenses related to said operation and maintenance."[106]  Cella argues that this language is mandatory and that EJGH stipulated to the breach by stipulating at trial that it has never operated any type of business on the Leased Premises.[107]  Thus, based on the four corners of the Lease and the stipulated facts, Cella asserts the Bankruptcy Court erred in failing to find EJGH breached the Lease by failing to operate a business on the Leased Premises.

In contrast, EJGH asserts that the Lease contains no express or implied mandate for EJGH to operate a business on the Leased Premises.[108]  Instead, EJGH contends that Cella approved of EJGH's anticipated use of the Leased Premises for a medical facility, but in no way was that use required by the Lease.[109]  EJGH contends that Section 8 of the Lease clearly provides that it is responsible for any operations that may occur, but does not dictate that those operations must occur.  EJGH also asserts that the Lease commencement date, indicating that EJGH's obligations under the Lease were to begin whether or not it received a license to operate a "community

---

[105] R. Doc. 4 at p. 15.
[106] *Id*. at p. 16 (*quoting* Lease, § 8) (internal quotation marks omitted) (emphasis added by Cella).  *See,* Trial Joint Exhibit 1 at § 8.
[107] R. Doc. 4 at pp. 15-16 (*quoting* Bankr. Docket R. Doc. 154 at ¶ 32) (internal quotation marks omitted).
[108] R. Doc. 7 at pp. 13-14 & 20-21.
[109] R. Doc. 7 at pp. 13-15 & 20-21.

emergency center," contradicts Cella's position that it had a mandatory obligation to operate a business on the Leased Premises.[110]

Contrary to Cella's strained interpretation of the Lease, the Court finds that the Lease does not require EJGH to operate a business on the Leased Premises. Section 8 of the Lease, regarding "General Lessee Responsibilities," provides that, "Lessee shall be responsible for operations and maintenance of the Leased Premises, including payment of all agreed-upon expenses related to said operation and maintenance."[111]   That provision further states that, "The operating maintenance expenses for which Lessee is obligated shall include, but not be limited to, Real Estate Taxes, Insurance, Utilities and Exterior and Interior Maintenance of the Leased Premises, except for those responsibilities outlined in Section 9 following."[112]   While Section 8 makes EJGH responsible for any operations and maintenance of the Leased Premises that *might* occur, the provision does not specify that EJGH *must* operate a business on the Leased Premises. The Lease further details what it considers *operating* expenses of the Leased Premises, none of which required the operating of a separate business or medical facility. Notedly, the Lease does not specify that Lessee shall be responsible for operation *of a medical facility/business*. Instead, the Lease states that "Lessee shall be responsible for operations and maintenance *of the Leased Premises*."

---

[110] *Id.* at pp. 14 & 21 (*quoting* Lease, § 3) (internal quotation marks omitted).  *See*, Trial Joint Exhibit 1 at § 3.
[111] Trial Joint Exhibit 1 at § 8.
[112] *Id.*

Further, and more importantly, Section 8 is silent as to the obligation or even the right, to operate any medical facility.  Nothing in Section 8, "General Lessee Responsibilities," obligates EJGH to operate a medical facility on the Leased Premises.  The fact that EJGH stipulated that it never operated a business on the Leased Premises does not change this result.  Again, Cella fails to direct the Court's attention to any language in the Lease that specifically requires EJGH to operate a business on the Leased Premises.  The Court also notes that the Bankruptcy Judge, after a three-day trial, concluded that the parties were "sophisticated commercial parties."[113]  Had these sophisticated commercial parties intended to bind EJGH to operate a medical facility on the premises, such an obligation would likely have been spelled out in the Lease. It was not. The Court further finds that other Lease provisions, including Sections 3, 7, and 28, support the Court's conclusion that the Lease does not obligate EJGH to operate a business on the Leased Premises.  For the same reasons previously articulated, the Court finds that these provisions indicate that EJGH was not required to operate a business on the Leased Premises.  As such, the Court finds that Cella has failed to show that EJGH breached the lease by not building a medical or emergency center on the Leased Premises.

### c.  EJGH's failure to properly maintain the Leased Premises.

Again relying on Section 8 of the Lease, Cella asserts that the Bankruptcy Court erred by not finding that EJGH breached the Lease by failing to maintain the Leased Premises.[114]  Cella claims that throughout this case, EJGH continually relied

---

[113] R. Doc. 1-2 at p. 18.
[114] R. Doc. 4 at p. 17.

26

on the fact that it paid rent as an excuse for its failure to fulfill other obligations under the Lease, including maintaining the property.   Cella leans heavily on commentary from Judge Brown, the bankruptcy judge previously assigned to this case, who commented during a motion hearing that, "Is it your argument that East Jefferson should just continue on forever paying the rent but not do anything else, not do – you don't really counter the allegations by Mr. Cella that there has been vermin in the place and that there's been non-repairs and it's unsightly, and you don't really contest that," and that, "I don't buy your argument that if you pay the rents that relieves you of all other obligations under the lease. I don't think there's any case ever gone that far."[115]  Cella argues that Judge Brown recognized that Section 8 of the Lease clearly obligated EJGH to operate a business on the Leased Premises, maintain the premises, and pay the enumerated expenses.[116] Cella also points to Section 11 of the Lease, entitled "Maintenance and Repair of Leased Premises," which obligated EJGH to "perform all maintenance and repair, renovations and replacements necessary or desirable to keep the Office Space and all associated improvements in good order, repair, condition and appearance at all times," and to "repair, clean, and renovate the said Leased Premises and associated improvements, as may be necessary."[117]  Relying on the trial testimony of its owner, George Cella, Cella argues that EJGH's failure to comply with its obligation to maintain the Leased

---

[115] *Id*. at pp. 17-18 (*quoting* Bankr. Docket R. Doc. 79 at pp. 17-18) (emphasis added by Cella).
[116] R. Doc. 4 at p. 18.
[117] *Id*. at pp. 18-19 (quoting Trial Joint Exhibit 1 at ¶ 11(A)).

Premises led to the building being infested with vermin, termites, homeless people, mold and mildew.[118]

EJGH asserts that it performed significant work at the Leased Premises, and paid a contractor over $2.5 million for this work, as well as an additional $442,297.12 in "design fees and reimbursables," which represented over 90% of the total anticipated amount of the project.[119]  EJGH claims that Bub Millet, the Senior Director of Facility Management for EJGH and the head of construction and maintenance for the Leased Premises on EJGH's behalf, testified that the Leased Premises were routinely maintained by EJGH staff.[120]  Millet further testified that while construction began on the Leased Premises in 2017, constructed was delayed later that year due to the Louisiana Department of Health halting the issuance of permits and the State of Louisiana's decision to no longer issue permits to build freestanding emergency rooms.[121]  EJGH asserts that the evidence shows it was a good faith tenant and continued to maintain the Leased Premises, and even made additional and substantial improvements after Cella's complaints.[122]  Specifically, EJGH claims that it spent over $100,000.00 to address Cella's complaint regarding the appearance of the exterior of the Leased Premises, that it spent approximately $141,526.63 to fix an issue with the slab, and spent approximately $16,275.46 in the

---

[118] R. Doc. 4 at p. 19 (*citing* Trial Testimony of George Cella, Bankr. Docket R. Doc. 163 at pp. 94-97).

[119] R. Doc. 7 at p. 7 (*citing* Trial Stipulations, Bankr. Docket R. Doc. 154); *See*, R. Doc. 4-1.

[120] R. Doc. 7 at p. 7 (*citing* Trial Testimony of Bub Millet, Bankr. Docket R. Doc. 163 at p. 240:22-24).

[121] R. Doc. 7 at pp. 7-8 (*citing* Trial Testimony of Bub Millet, Bankr. Docket R. Doc. 163 at p. 241:13-243:21).

[122] R. Doc. 7 at p. 8.

associated design fee.[123]  Apart from these improvements, EJGH claims that when Cella complained of purported rodents and termites, EJGH responded by having the property inspected by qualified professionals.[124]

Although the parties dispute whether EJGH sufficiently maintained the Leased Premises, the parties seem to agree that the Lease requires EJGH to maintain the premises.  Based upon the four corners of the Lease, the Court reaches the same conclusion.  Sections 8 of the Lease specifies that EJGH "shall be responsible for the operation and maintenance of the Leased Premises," and Section 11 requires EJGH to "perform all maintenance, repairs, renovation and replacements necessary or desirable to keep the Office Space and all associated Improvements in good order, repair, condition and appearance at all times, and shall, at its own expense, repair, clean, and renovate the said Leased Premises and associated Improvements, as may be necessary."[125]  These provisions are clear and unambiguous, and require EJGH to maintain the Leased Premises, including the interior of the building located on the premises.

To the extent Cella seeks review of the Bankruptcy Court's finding that EJGH's actions did not constitute a breach of the Lease, Cella has failed to show that the Bankruptcy Court's finding constitutes clear error.  Instead, Cella attempts to hang its hat on commentary from a pretrial hearing held by Judge Brown prior to his

---

[123] *Id*. at p. 11 (*citing* Trial Testimony of Bub Millet, Bankr. Docket Doc. 163 at pp. 254:1-8 & 233:7-234:14).
[124] R. Doc. 7 at pp. 11-12 (*citing* Trial Testimony of Bub Millet, Bankr. Docket R. Doc. 163 at pp. 254:17-255:4).
[125] Trial Joint Exhibit 1 at §§ 8, 11.

retirement and the reassignment of this case to Judge Grabill over a year ago on July 16, 2020.[126]  Although colorful, the Court does not find the comments by Judge Brown add any value to the Court's assessment of Cella's breach of contract claim, which claim was dismissed by Judge Grabill after a three-day trial.  It would not be appropriate for this Court to find the commentary to be evidence in this case.  Nor does the Court do so.  Judge Grabill was no doubt aware of Judge Brown's views of the case, and reached her own conclusions after hearing all of the testimony and evidence at the trial.  Beyond Judge Brown's statements, Cella relies only on the self-serving testimony of its owner, George Cella, and one of Cella's "corporate representative[s]," Martha Sassone, who testified at trial that the Lease's "operation language" "means exactly what it says, that 'they have to operate and maintain the leased premises.'"[sic][127]  The Court finds this evidence is insufficient to show that the Bankruptcy Court clearly erred in weighing the evidence and finding that EJGH's actions did not breach the Lease.

### d. **EJGH's failure to obtain and maintain the required insurance.**

Finally, Cella asserts that the Bankruptcy Court erred by failing to find that EJGH breached the Lease by not obtaining and maintaining the required insurance.[128]  Cella claims that the Lease required EJGH to procure certain policies of insurance to protect Cella, including worker's compensation, builder's risk, and

---

[126] R. Doc. 1-2 at pp. 4-5.
[127] R. Doc. 4 at p. 17 (*citing* Trial Testimony of George Cella, Bankr. Docket R. Doc. 163 at pp. 92-97; Trial Testimony of Martha Sassone, Bankr. Docket R. Doc. 164 at pp. 419-21).  *See*, R. Doc. 4 at pp. 17-19.
[128] R. Doc. 4 at p. 20.

general liability, among others.  Cella asserts that after discovery and as proven at trial, EJGH cancelled its builder's risk insurance policy, which was required by the Lease.  Cella claims that EJGH stipulated at trial that, "In the month of July 2018, EJGH added interior store-front installation and painting of the exterior."[129]  Cella argues this work was performed after the builder's risk insurance had lapsed and clearly shows that EJGH breached the Lease.  Cella also asserts that EJGH breached the Lease by self-insuring for the first $500,000 of any loss, in violation of Section 13 of the Lease, regarding "Insurance and Indemnity."[130]  Cella points out that one of EJGH's witnesses at trial testified that EJGH is not an insurance company, and that they self-insure.[131]  Cella contends that this was a clear violation of the Lease.

In response, EJGH asserts that it met its insurance obligation under the Lease.[132]  EJGH claims that it presented evidence at trial of numerous insurance policies, and that Ellen Marallo, EJGH's Risk Manager and Compliance Analyst, testified that EJGH maintained builder's risk coverage for the Leased Premises through January 2, 2018,[133] and that EJGH listed Cella as an additional insured where required.[134]  Marallo also testified that before expiration of the builder's risk coverage, the Leased Premises was added to EJGH's property insurance schedule.[135]

---

[129] *Id*. (*quoting* Bankr. Docket R. Doc. 168 at p. 22) (internal quotation marks omitted).
[130] R. Doc. 4 at p. 20
[131] *Id*. at p. 21 (*citing* Trial Testimony of Ellen Marallo, Bankr. Docket R. Doc. 164 at p. 409).
[132] R. Doc. 7 at p. 12.
[133] R. Doc. 7 at p. 12 (*citing* Trial Testimony of Ellen Marallo, R. Doc. 164 at pp. 377:1-378:2, 380:21-25, & 381:1-10).
[134] R. Doc. 7 at p. 12 (*citing* Trial Testimony of Ellen Marallo, Bankr. Docket R. Doc. 164 at pp. 374:23-414:21).
[135] R. Doc. 7 at p. 12 (*citing* Trial Testimony of Ellen Marallo, Bankr. Docket R. Doc. 164 at p. 378:5-13).

EJGH points out that there were no insurance claims on the Leased Premises and there were no circumstances or incidents for which Cella was not covered. As such, EJGH argues that Cella's breach of contract claim based upon the required insurance coverage lacks factual substances or even alleged damages, and that taking issue with EJGH's self-insurance seems to be a misunderstanding of the insurance process on Cella's part.[136]

Relying upon the "credible and unrefuted testimony" of Ellen Marallo, as well as documentary evidence regarding insurance coverage under the Lease, the Bankruptcy Court concluded that EJGH maintained all required insurance coverage during the term of the Lease, maintained builder's risk insurance up to the date that development of the Leased Premises was interrupted on January 2, 2018 (satisfying the Lease's requirement for such coverage "while work is underway"), and listed Cella as an additional insured where required.[137]   The Bankruptcy Court noted that Clarence "Bub" Millet, Senior Director of Facility Management for EJGH, testified that he instructed the contractor performing work to develop the Leased Premises to let the builders risk insurance policy lapse as of January 2, 2018 because he had received instruction that EJGH's development of the Leased Premises would be "holding for now."[138]   Although Cella disagrees with the Bankruptcy Court's ruling, Cella has failed to show that the Bankruptcy Court erred in failing to find that EJGH

---

[136] R. Doc. 7 at p. 13.

[137] R. Doc. 1-2 at p. 21 (*citing* Hearing Transcript, Bankr. Docket 164 at pp. 374:23-414:21 (Sept. 21, 2020); Trial Joint Exhibits 5-7 & Trial Exhibit J).

[138] R. Doc. 1-2 at p. 21, n.9 (*citing* Hearing Transcript, Bankr. Docket 163 at pp. 281:15-21, 289:8-15 (September 18, 2021); Trial Exhibit 28).

breached the insurance requirements of the Lease.  As previously mentioned, this Court will reverse the Bankruptcy Court's factual findings "[o]nly upon a definite and firm conviction" that the Bankruptcy Court erred.[139]  The Court lacks any such definite or firm conviction.  Accordingly, the Bankruptcy Court's decision on this issue is affirmed.

### B. Cella's Claim for Damages.

Finally, Cella asserts that the Bankruptcy Court "erred in failing to find that due to the numerous breaches of the Lease, Cella was irreparably damaged in an amount exceeding several million dollars," and that George Cella is "in bankruptcy today because of [EJGH]."[140]  Because the Court has determined that the Bankruptcy Court did not err in concluding that Cella failed to meet its burden to show that EJGH breached the Lease, the Court need not address Cella's claim for damages. Accordingly, the Court affirms the Bankruptcy Court's decision that Cella is not entitled to damages on any of the claims in its state court Petition.[141]

## IV.   CONCLUSION

For the foregoing reasons, the Court **AFFIRMS** the Judgment of the Bankruptcy Court, finding that Cella III, LLC failed to meet its burden of showing that EJGH breached the Lease and that Cella III, LLC is not entitled to damages on any of its claims in its state court Petition, and dismissing the Petition in its entirety.

---

[139] *In re Quinlivan*, 434 F.3d 314, 318 (5th Cir. 2005) (citing *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).
[140] R. Doc. 4 at pp. 23-26.
[141] R. Doc. 1-2 at p. 22.

**IT IS FURTHER ORDERED** that Cella III, LLC's Appeal is **DISMISSED WITH PREJUDICE.**

New Orleans, Louisiana, September 30, 2021.

**WENDY B. VITTER**
**United States District Judge**